## Chicago & E. I. R. R. Co. v. Kate Argo, Adm'x.

1. NEGLIGENCE—*Presumption of, Raised Against Railroad by Violation of City Ordinance.*—Running trains at a speed which violates a city ordinance raises a presumption of negligence against a railroad company under the statute.

2. MASTER AND SERVANT—*Relation Can Not Exist Without the Assent of Both.*—The relation of master and servant can not exist in such a sense as to create the duty of employer and employe without the express or implied assent of both parties. No one can intrude himself into the service of another person independently of such person's consent or acquiescense.

3. SAME—*Volunteer Can Not Charge Railroad Company With the Duty of an Employer.*—The greater weight of authority sustains the doctrine that a volunteer can not charge a railroad company with the duty of an employer.

4. SAME—*Where the Maxim Respondeat Superior Does Not Apply:*—Where a mere volunteer, that is, one who has no interest in the work, undertakes to assist the servant of another he does so at his own risk. In such a case the maxim *respondeat superior* does not apply.

Action in Case.—Trial in the Circuit Court of Iroquois County; the Hon. JOHN SMALL, Judge, presiding. Verdict and judgment for plaintiff; appeal by defendant. Heard in this court at the May term, 1898. Reversed. Opinion filed December 14, 1898. Rehearing denied May 19, 1899.

FRANK L. HOOPER and FREE P. MORRIS, attorneys for appellant; W. H. LYFORD, of counsel.

C. C. CHAMBERLIN and R. W. DOYLE, attorneys for appellee; PAYSON & KESSLER, of counsel.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

On April 13, 1896, Harry Mac Argo, then seventeen years old, was struck and killed by a freight train of appellant at Hoopeston. This suit was brought by his administratrix to recover for the benefit of his next of kin their consequent pecuniary loss. Plaintiff recovered $3,000 and defendant appeals.

Before the close of the trial plaintiff's pleadings had been reduced to the fifth count of the declaration. It averred the accident occurred within the corporate limits of the city of Hoopeston, and pleaded an ordinance of said city then in force restricting freight trains to a speed of six miles per hour within said limits, and charged it was defendant's duty to run its engine and freight train at a speed not exceeding six miles per hour within said limits; and the count averred that defendant, negligent of its duty in that regard, at said time ran its locomotive and freight train at a speed greatly in excess of that limited by said ordinance, to wit, forty miles per hour; and that while Argo, with all due diligence for his own safety, was lawfully upon said railroad track, defendant so carelessly and improperly drove said engine and freight train that by and through the negligence of defendant in that behalf said engine and train ran against and struck Argo and he was thereby killed. This count was defective in not specifically averring that the death was caused by the act of defendant in running its train at a greater rate of speed than was allowed by the ordinance; but a declaration having a like infirmity was held good after verdict in L. S. & M. S. Ry. Co. v. O'Connor, 115 Ill. 254.

Five railroad men testified to the speed of the train, one called by plaintiff and four by defendant. None of them put the speed at less than eight, and none over twelve miles per hour. The railroad man called by plaintiff testified the speed was eight or ten miles per hour. The plaintiff called

five other witnesses on this subject not familiar with the running of trains, one of whom fixed the speed of the train at ten or fifteen miles per hour and the others gave estimates ranging from fifteen to twenty-five miles per hour. It is clear the ordinance was violated, but there are other facts in the evidence which lead us to the conclusion that the higher estimates just stated can not be correct. The accident occurred opposite or nearly opposite appellant's depot at Hoopeston. Appellant's road runs north and south. Fifty feet north of the depot the Lake Erie & Western Railroad crosses appellant's road, running east and west. These railroads have an interlocking system to control the approach of trains to said crossing. Appellant's road has a double track, and the train which struck Argo was an extra, bound south on the west track, and had thirty-four freight cars. As that train approached the railroad crossing it was necessary its engineer should have it under complete control, because, unless the track was so adjusted by the tower man that the train could pass over the crossing, it would be derailed before it reached the other railroad. The system there in use required the engineer to have his speed so reduced that he could if necessary, bring his train to a full stop before he reached the derailing apparatus. The signals and the interlocking machinery were under the control of a man in the tower situated where he had a view of trains approaching from both directions on both railroads. It was not only proved without contradiction that on this occasion the engineer of the freight train in question had its speed reduced, his train under control, and steam shut off as he approached the railroad crossing and signals, but it is evident that the ordinary instincts of self-preservation would cause him to take those precautions. When two or three hundred feet north of the home semaphore the engineer put on steam again and his fireman began putting in coal, and they were going sufficiently slow so that the fireman had finished firing up before they reached the Lake Erie crossing. We think it manifest that a freight train of thirty-four cars, which had shut off steam and slowed down

to such an extent that, if necessary, it might be entirely stopped before it reached the derailing appliances, could not in so short a distance thereafter regain a speed of fifteen to twenty-five miles per hour. On this subject the estimates of the railroad men called on both sides have, in view of these circumstances, greater weight and probability than those made by the inexperienced witnesses who placed such high estimates upon the speed of the train. There is no proof Hoopseton is a populous or crowded city, nor that the railroad passed through a populous or crowded part of Hoopeston. The evidence therefore did not justify the jury in finding that the train was running at a high and dangerous rate of speed or in reckless disregard for human life, nor did plaintiff so aver in the fifth count. Neither the engineer nor the fireman of the south-bound train saw Argo, and therefore there is no foundation for charging them with wantonly or willfully killing him, nor did the fifth count so charge. As appellant was not so charged in the declaration no such issue was before the jury. (C. & A. R. R. Co. v. Robinson, 106 Ill. 142.) All that was proved on that subject was that the train was run at a speed which violated the ordinance. Under the statute this raised a presumption of negligence against appellant. I. C. R. R. Co. v. Ashline, 171 Ill. 313.

Our next inquiry is what relation Argo bore to appellant. Appellant's station agent at Hoopeston was also agent for an express company. Some months before this accident Argo was in his employ for about three months, and assisted him generally in his express and railroad business. The company never authorized the station agent or any other of its employes at Hoopeston to hire Argo or to hire anyone else to assist them, and the company never paid Argo anything, nor is there any proof that any of its officers ever knew that he had been thus employed by the station agent. The hiring of employes for appellant was exclusively in the hands of officers who did not live at Hoopeston. The agent paid Argo from his own funds for the services just mentioned. That relation ceased some months before the acci-

dent.   After Argo ceased working there for pay he was often around the depot of his own accord.   He was very willing to make himself handy, and helped the railroad men, more or less, about the station.   He sometimes assisted in handling the baggage at passenger trains.   Van Cleave was the yard clerk and baggage man.   On the day Argo was killed Van Cleave wished to attend a funeral.   With the consent of the station agent he got Argo to act as his substitute during the funeral, and Argo did so act from one to 4:30 P. M., when Van Cleave returned to duty and relieved him.   In the evening Argo was again about the depot.

The block system was in use on appellant's railroad. From Hoopeston to Wellington north constituted one block. After one train had left Hoopeston for Wellington no other train could leave Hoopeston going north until the telegraph operator at Hoopeston had received notice that the first train had reached Wellington, unless the train dispatcher saw fit to send to the second train what was called a permissive card, being a telegraphic permission to enter the block before it was clear.   When one train had entered a block and the operator saw another train behind it ready to start, it was customary for him when he reported the departure of the first to notify the dispatcher of the arrival of the second train, and that it was ready to depart, and to ask a permissive card for it.   If the operator got the order he signaled the train to come on, and if he was not otherwise engaged it was then his duty, in order to prevent the train from being unnecessarily delayed, to go out and hand one copy of the order to the engineer or head brakeman on the engine, and another copy to the conductor on the rear car. There was a platform on each side of the tracks, and the depot was west of the west platform.   If in such a case the train to receive the permissive card was going north and the operator had time to cross over to the east platform east of the tracks before the train reached him he was expected to do so, and to hand the permissive card to the engineer, who sat on the right-hand or east side of the north-bound engine, and to whom the card was addressed.   When the operator

thus crossed both tracks and went to the east side of the train, he was in a place of entire safety. If he did not have time to cross over ahead of the north-bound train he either handed the order up from the west side of the engine or let the train stop north of the Lake Erie crossing and a train hand come back for the order. At Hoopeston the second train could, without obtaining permission, pull by the depot and beyond the interlocking system, and then stop and wait till the block was released or till a man went back and got a permissive card. In the center of the depot at Hoopeston was a bay window on the side toward the tracks. The operator's table stood in this bay window.

About a quarter after seven o'clock that evening train No. 70 passed north, and extra 127, a freight train, came up from the south and stopped about a couple of city blocks south of the depot. When it was ready to go and began to move Argo went into the waiting room and from there into the office, got the operator's lantern, came out, gave a signal with the lantern to extra 127 to come on, went back into the office where the operator was getting the permissive card, took two copies which the operator had laid on a table, went out, stood between the tracks till the train came up, and then attempted to deliver a copy to the fireman on the west side of the engine. Argo so held his lantern that the fireman was unable to see and seize the telegram. Argo then ran along side of the train a few steps and succeeded in delivering the order. The fireman called out to Argo to look out for the south-bound train, as did also several other persons. The evidence tends to show Argo had time to cross to the west platform, but that he stood for a little time, and then turned and started back to the depot, and stepped immediately in front of the south-bound train previously described, and was by it struck and killed.

The evidence is conflicting upon the question how Argo came to attempt this service. Just before this he was standing on the platform in front of the bay window. According to a bystander the operator tapped on the window and Argo went in. According to the operator, Argo tapped on

the window and called the operator's attention to extra 127. The operator testified that when some person came in and took the orders from his table he was very busy and did not look at the person, but supposed it was one of the train-men, and did not at the time know that it was Argo. He did, however, from his bay window, see Argo go out of the waiting room of the depot with the order in his hand, and he then knew Argo was going to deliver it to the train, and he did not attempt to prevent his doing so. In his sworn statement before the coroner's jury the operator said Argo had done this work before in the day time, but not at night, and that he knew Argo understood how to do it. It is claimed by plaintiff there were four other persons in the office at the time, one of whom, called by plaintiff, testified Argo, as he took up the order, said he would deliver it, and the other three testified for defendant, that this other person was not present in the office, and that they did not hear anything said by the person who came in and took out the order. The jury could have found from the evidence that the operator tapped on the window and in that way requested Argo's assistance. It is certain that when Argo went out of the waiting room the operator then knew he had the order and was going to deliver it, and was content that he should do so.

Argo was not an employe of appellant. He had never been hired nor paid by appellant. At the time he was killed he was not acting under any employment for pay by any one, and no one at that station had ever had any authority to hire him to work for the railroad company. The rule governing such a case is thus stated in 3 Elliott on Railroads, Sec. 1305:

"A person can not make himself the employe of a railroad company by his own act, for the relation of master and servant can not exist in such a sense as to create the duty of employer to employe without the express or implied assent of both parties. No one can intrude himself into the service of another person independently of the latter person's consent or acquiescence. It follows from this that no one who, without any employment or any request, express or implied,

from a railroad company, assumes to enter the service of the company, can not create the relation of master and servant. If that relation does not exist, one who assumes to perform service for the company must be regarded as a mere volunteer, without any right whatever to insist that the company owes him a duty as master or employer. Duty can not exist where there is no relation between the parties creating it. The overwhelming weight of authority sustains the doctrine that a volunteer can not charge a railroad company with the duty of an employer. If there is authority to employ the persons who undertake to render service then the general rule will not apply. Ordinarily, trainmen have no authority to employ servants for the company. There may be cases where the circumstances are such as to confer authority, but such cases are exceedingly rare."

Indeed, during the trial of this case, appellee's counsel consented the record should show Argo was not employed. Argo had no personal interest in the work being done. This case is therefore distinguished from those in which the person, though not obliged to act, yet has an interest in the act being done, as where the owner of goods which have been shipped by a railroad company assists its employes in unloading them. In such a case the person is engaged in his own business, and may be entitled to protection from negligence of the servants of the carrier of his goods. But where the person injured has no interest in the act being done the rule is otherwise.

"Where a mere volunteer, that is, one who has no interest in the work, undertakes to assist the servant of another he does so at his own risk. In such a case the maxim *respondeat superior* does not apply." 2 Bailey's Personal Injuries, Sec. 3258; 2 Thompson on Negligence, 1045.

The principle is thus stated in 28 Am. & Eng. Ency. of Law, 499:

"A person who gives his services without any express or implied promise of remuneration in return is called a volunteer, and is entitled to no remuneration for his services, nor to any compensation for injuries sustained by him in performing what he has undertaken."

In Everhart v. T. H. & I. R. R. Co., 78 Ind. 292, an em-

ploye of defendant requested plaintiff to go upon a car and set a brake.  Plaintiff complied, and while so engaged was injured by the negligence of the servant of defendant.  The court said:

"The plaintiff was a mere volunteer, consenting, at the request or direction of an employe of defendant,'to perform services which should have been performed by the employes themselves; and while he can not be regarded as an employe, he is in no better condition than if he had been. Nor is he in any better condition legally than if he had been a mere intermeddler, undertaking to perform the service without request or direction from any one, because, as we have seen, he was not requested or directed to get upon the car and apply the brake by any one having power from defendant to authorize him to do so."

In Sherman v. H. & St. J. R. R. Co., 72 Mo. 62, a lad was paying for a ride on a freight train by doing work on the train by direction of a brakeman.  While so employed he was injured.  The court said :

"The control assumed by the brakeman over the plaintiff, and his directions to him to render various services on the train, and especially the service in which he was injured, were wholly unwarranted and unauthorized, and the master can not be held liable for the consequences of such acts.  When an act done by a servant is within the scope of his employment the master will be liable, although the servant does not obey his orders as to the manner of its performance.  But it was no part of the duty of the brakeman, so far as this record shows, to employ or to direct any person, much less a passenger, to perform any service on the train, and if without such authority he negligently led the plaintiff into danger, such negligence is his own and can not be imputed to the master."

In Flower v. Penn. R. R. Co., 69 Pa. St. 210, a boy was climbing upon the tender of an engine to perform a duty of the fireman at the latter's request, and while so engaged was killed.  The court, in language very applicable to this case, said :

"This is a very hard case.  A willing, bright boy, not arrived at years of discretion, has lost his life in simply trying to oblige the fireman.  But we must not suffer our sympathies to do injustice to others by overriding those

fixed principles which underlie the rights of all men and are essential to justice. It is natural justice that one man should not be held liable for the act of another without his participation, his privity or his authority. It is clear that the fireman, through his indolence or haste, was the cause of the boy's loss of life. Unless his act can be legally attributable to the company it is equally clear the company was not the cause of the injury. The maxim *qui facit per alium facit per se* can apply only where there is authority, either general or special. * * * The true point of this case is that in climbing the side of the tender or engine at the request of the fireman, to perform the fireman's duty, the son of the plaintiff did not come within the protection of the company. To recover, the company must have come under a duty to him which made his protection necessary."

Other cases in support of this principle are collected in the notes to Church v. C., M. & St. P. R. R. Co. (Minn.), 16 L. R. A. 861, and Evarts v. St. P., M. & M. R. Co. (Minn.), 22 L. R. A. 663. A doctrine, apparently in conflict with the foregoing, is laid down in Johnson v. Ashland Water Company, 71 Wis. 553, and cases there cited. We are, however, of opinion that the rule we have stated is supported by the great weight of authority, and that it rests upon established principles. If this had been a case where a man hired by a farmer to run a mower had, without the authority of the farmer, requested or permitted a friend to perform for him some service about the sickle, and while the latter was so engaged in a place of danger he had been hurt or killed by the negligence of some other servant hired by the same farmer, whether a fellow-servant of the first or not, we think no one would consider the farmer liable in damages for the injury. It would, we think, be readily seen that the farmer could not be liable to a man he had never hired or authorized to be hired, and who had voluntarily and unnecessarily put himself in a place of danger about the farmer's business, without the farmer's knowledge or consent.

Where one thus intrudes himself into a position of danger the company, whose servant he is thus voluntarily assisting, owes him the duty of refraining from doing any willful injury, and generally that is its only duty to him. (3 Elliott

on Railroads, Sec. 1305; 2 Bailey on Personal Injuries, Sec. 3261.) Can the inference that the injury was willful or wanton be deduced from the mere fact that the train was run at a speed which violated the ordinance? A negative answer to this question was given in I. C. R. R. Co. v. Hetherington, 83 Ill. 510, and Blanchard v. L. S. & M. S. Ry. Co., 126 Ill. 416; and, inferentially so, in Austin v. C., R. I. & P. R. R. Co., 91 Ill. 35. There being neither allegation, direct proof nor inference to justify a finding that deceased lost his life by any willful or wanton act of appellant's servants, the conclusion follows that appellant is not liable in this case.

A further reason exists why we conclude appellee was not entitled to recover. The proof shows Argo stood between the tracks from one to five minutes, waiting for extra 127 to come up. He had time to pass over to the east platform, where he would have been in a place of entire safety, and, according to the proofs, that was the place where the operator should stand to deliver such train order to a north-bound train, if he had time to reach it before the train came along. Argo unnecessarily remained in a place of danger. The headlight of the train which struck him was burning, and was in full view for a distance of half a mile from the place where Argo stood. The proof is clear that the engine of that train gave a long whistle as it approached the station, and two long and two short whistles when from two hundred to three hundred feet north of the depot, and that its bell was ringing. Certain witnesses for plaintiff did not hear the whistles nor the bell, but not only was the giving of these signals sworn to positively by trainmen of both trains, and by the man in the tower house, whose duty it was to watch for the whistles, but also under the usages governing the interlocking system at this place, it was the part of the engineer to whistle, to notify the man in the tower that he wished to cross the Lake Erie tracks. If one train on each road chanced to be approaching at the same time, the one which gave the first whistle was first given the right of way over the crossing. To approach the crossing without

whistling was to render the engineer liable to have his train derailed or unnecessarily stopped. This evidence and these facts and usages make the negative testimony of those who did not hear the signals of little value. Again, there was a distance of nine feet between the west rail of the east track and the east rail of the west track, leaving a clear space of six feet between the freight trains. If Argo had remained where he was when he handed up the telegram he would not have been struck. The preponderance of the evidence also indicates that he then had time to reach the west plat-form before the south-bound train arrived at that point. He seems to have hesitated a moment, and then stepped immediately in front of the coming train. It is clear that if, at any time after he came out of the depot with the order and up to the time he delivered it, he had looked north he must have seen this train in time to have escaped danger. If he had been listening for signals he must have heard the whistles and the bell. It was night and he could be seen but a short distance. He was familiar with the running of trains at that point, and knew an extra might come along at any time, and knew he was in a place of danger. Under all these circumstances we are of opinion deceased was not exercising due care for his personal safety, and that for lack of such care his administratrix can not recover.

The judgment will therefore be reversed.

MR. JUSTICE WRIGHT, dissenting.

I dissent from all that part of the opinion of the majority of the court that holds the deceased was a mere volunteer, and not entitled to the rights of an employe of the appel-lant. I concur in the conclusion upon the other reasons contained in the opinion.

**Finding of Facts,** to be incorporated in the judgment.

We find plaintiff's intestate was struck by a freight train of appellant within the city limits of the city of Hoopeston, and was thereby killed; that said train was running at a speed forbidden by ordinance, but not at a high and dan-

gerous speed, nor in reckless disregard of human life; that deceased was not killed by any willful or wanton act of appellant's servants; that deceased was at that time upon appellant's tracks, assisting a servant of appellant in the performance of his duty, and, as the evidence tends to show, at the servant's request; that deceased had not been hired by appellant, and was a volunteer, and appellant is, therefore, not liable for his death. We further find that at said time deceased was not exercising ordinary care for his personal safety.